# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 17CR560 WQH |
|---|---|
| Plaintiff, | ORDER |
| v. | |
| LUIS MAYEA-PULIDO, | |
| Defendant. | |

HAYES, Judge:

The matter before the Court is the motion to suppress evidence and suppress statements (ECF No. 22) filed by Defendant Luis Mayea-Pulido.

**FACTS**

On February 6, 2017, at approximately 8:15 p.m., United States Border Patrol Agent Julio Leon was working in the area of the Barret Café in Dulzura, California at the intersection of Barret Lake Road and State Route 94. The café is located in an area approximately three miles north of the border between the United States and Mexico, commonly known for alien smuggling activity. Barrett Lake Road is known to Agent Leon as one of the main roads that smugglers use to circumvent the State Route 94 checkpoint.

Agent Leon, Agent Hassan Safy, and Agent William Stone were standing in the parking lot of the café. The supervisor had called for a meeting at that location. Agent Leon testified that it was a dark cold, rainy night; and that the café was not open for business. Agent Leon observed two vehicles a yellow Hummer and a Chevy truck that

stopped and then proceeded up Barrett Lake Road. As the agents were talking, Agent Leon noticed the Chevy truck come back and pull into the parking lot for a few minutes, and then leave the parking lot. A few minutes later, Agent Leon saw the Chevy truck for a third time parked across Barret Lake Road in a small parking area near a bus stop pole.

Agent Leon crossed the road and asked the two female occupants of the truck if they were lost. The occupants of the truck told Agent Leon that they thought that they had a flat tire. Agent Leon used his flashlight to inspect the tire and told the driver that the tire was not flat. The driver told Agent Leon that she was going to go home and identified home as Escondido. The truck left the parking lot and drove west on Route 94. Agent Leon went back across the road.

A few minutes later, the agents noticed that a person, later identified to be the Defendant, and a dog appear in the parking lot standing near the bus pole. Agent Leon, Agent Safy and Agent Stone went back across the road to talk to the person. Agent Leon and Agent Stone testified that they were dressed in plain clothes and armed. Agents testified that no weapons were visible or drawn. Defendant testified that two agents had their hands on their holster and that one agent had his weapon drawn and pointed at the ground. Agent Leon recognized the person as someone that he had seen earlier in the day in the same spot and that he recognized the dog. Agent Leon testified that he does not see people standing in this location with dogs very often.

The agents observed that Defendant was wearing wet and dirty layered clothing and attempting to make a call on a cell phone. Agent Leon paid attention to the dog while Agent Stone asked Defendant what he was doing in the area. Defendant told Agent Stone that he was in the area visiting a friend, that the friend had to go to work, and that the friend dropped him off at the closest bus stop. The agents knew that the bus came through at around 4 p.m. and that no bus ran at this time of the evening. Agent Stone asked Defendant who he was trying to contact, and Defendant stated that he was contacting his girlfriend to have her pick him up. Defendant stated that his

girlfriend was driving a pickup truck. Agent Stone asked Defendant where he was born. Defendant replied San Diego. Agent Stone asked Defendant for his name and date of birth and walked back across the road to the café parking lot to run a records check through dispatch.

Agent Stone called dispatch to check the name and date of birth given to him by Defendant. Dispatch told the agent that there was an alien registration number associated with the name and date of birth. Dispatch asked the agent if Defendant had any tattoos on his arms. Supervising Border Patrol Agent Zimmer and Agent Stone returned back across the road and confirmed that Defendant had tattoos on his arms. Agent Stone asked Defendant again where he was born. Agent Stone stated "I asked him to tell me where he was born, don't lie to me, you know I was on the phone, and I know the answer." Defendant stated that he was born in Mexico and that he was not legally in the United States. Defendant was placed under arrest.

## CONTENTIONS OF THE PARTIES

Defendant contends that agents did not have reasonable suspicion to seize his person when they walked across the street and questioned him. Defendant asserts that the officers displayed weapons and commanded him to answer their questions. Defendant asserts that he was standing at a public bus stop and that the officers had no reason to question him. Defendant further contends that he was arrested without probable cause. Defendant contends that any statements made after the call to dispatch, confirming that Defendant had an A-file number, must be suppressed as a violation of his *Miranda*[1] rights. Finally, Defendant contends that the Court must suppress the fingerprint evidence taken from him as a result of the unconstitutional seizure pursuant to the exclusionary rule.

The Government contends that the initial encounter with Defendant in the parking lot was consensual. The Government asserts that the agents approached Defendant after seeing him standing in an area where a daytime bus might pick up

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

passengers knowing that there would be no bus at that time of night. The Government asserts that moving the conversation across the street did not convert the encounter into a seizure. The Government contends that, even assuming a seizure, questioning by the agents was justified by reasonable suspicion of criminal activity. The Government further contends that there was no *Miranda* violation because Defendant was not in custody prior to any questioning. Finally, the Government contends that the Court may order new fingerprint exemplars to be used at trial to establish Defendant's identity, even if there were grounds to suppress the initial fingerprints taken upon his arrest.

## RULING OF THE COURT

"The prohibition of unreasonable searches and seizures extends to seizures of the person, including the brief investigatory stop of [a person] or vehicle." *United States v. Rodriguez*, 976 F.2d 592, 594 (9th Cir. 1992). An officer may not detain a person without a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *U.S. v. Cortez*, 449 U.S. 411, 417-18 (1981). A *Terry* stop[2] is a brief investigatory stop which is an exception to the probable cause requirement of the Fourth Amendment. "The Fourth Amendment does not proscribe all contact between the police and citizens, but is designed to 'prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *INS v. Delgado,* 466 U.S. 210, 215 (1984) (quoting *U.S. v. Martinez*, 428 U.S. 543, 554 (1976). "Beginning with *Terry v. Ohio,*[], the Court has recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. (citation omitted.) To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's actions must be 'justified at its inception, and ... reasonably related in scope to the circumstances which justified the interference in the first place.'" *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 185 (2004) (citing *U.S. v. Sharpe*, 470

---

[2]*Terry v. Ohio*, 392 U.S. 1 (1968).

U.S. 675, 682 (1985)).

"While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion requires the agents making the stop to be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form the basis for particularized suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). "Whether reasonable suspicion exists depends upon the totality of the circumstances surrounding the stop, including 'both the content of information possessed by police and its degree of reliability.'" *United States v. Williams*, 846 F.3d 303, 308 (9th Cir. 2016) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).

In this case, the agents were working an area three miles north of the international border commonly known for alien smuggling activity. The area was remote, dark, and the café across the road was not open. The agents observed a Chevy truck pass their location three times within a fifteen minute period and then park in a parking lot. The agent approached the truck, and the driver explained that she thought she had a flat tire. The agent checked the tire, the tire was not flat, and the truck drove off. The agents then observed a person appear at the location where the Chevy truck was parked and stand by a bus stop in a remote area where no bus was coming that evening. The Court concludes that the agents did not violate any right of the Defendant under the Fourth Amendment when they walked across the road and asked Defendant what he was doing and if he was lost.[3] In *Florida v. Bostick*, the Supreme Court explained that "[a] seizure does not occur simply because a police officer approaches an individual and asks a few questions. . . . Only when the officer, by means of physical force or show of authority,

---

[3] The Court finds the testimony of the agents that there were no guns drawn or visible when they approached the Defendant to be credible.

has in some was restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 501 U.S. 429, 434 (1991) (quoting *Terry*, 392 U.S. at 19 n.16).

At the initial encounter Defendant told the agents that he was born in San Diego, that he was dropped off at the bus stop, and that his girlfriend was coming to pick him up in a pickup truck. The agents observed that Defendant was wearing layered clothing and that he was wet and dirty. The agents observed Defendant standing near a bus pole after dark in January in a remote area three miles north of the border attempting to contact someone by phone. The Court finds that the totality of the circumstances supported reasonable suspicion to believe Defendant had illegally entered the United States. The Court concludes that the agents did not violate any right of the Defendant under the Fourth Amendment when they asked Defendant to come across the road while they called dispatch. After Agent Stone learned that the name and date of birth matched someone with an alien registration number, Agent Stone was not required to administer *Miranda* warnings prior to asking Defendant whether he had a legal right to be in the United States. Even if there was a Fourth Amendment violation, independent evidence of Defendant's identity would be not suppressed under the exclusionary rule. *See United States v. Garcia-Beltran*, 443 F.3d 1126, 1132 (9th Cir. 2005) ("The Ninth Circuit has consistently held that evidence concerning the identity of a defendant, obtained after an illegal police action, is not suppressible as 'fruit of the poisonous tree.'").

IT IS HEREBY ORDERED that the motion to suppress evidence and suppress statements (ECF No. 22) filed by Defendant Luis Mayea-Pulido is denied.

DATED: November 2, 2017

**WILLIAM Q. HAYES**
United States District Judge